UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID GERMAIN, et al.,

                                    Plaintiffs,

        v.

M&T BANK CORPORATION, et al.

                                    Defendants.

No. 13-CV-7273 (KMK)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

Appearances:

Nichelle Aniece Johnson, Esq.
Law Offices of Nichelle A. Johnson, PLLC
New Rochelle, NY
*Counsel for Plaintiffs David Germain,*
*Lexington Capital Associates LLC, and the*
*Zherka Family Irrevocable Trust*

Peter Howard Tilem, Esq.
Tilem & Campbell, LLP
White Plains, NY
*Counsel for Plaintiffs*

Cathy Ann Fleming, Esq.
Selyn Hong, Esq.
Hodgson Russ, LLP
New York, NY
*Counsel for Defendants*

Jillian Marie Searles, Esq.
Robert Scharger, Esq.
Hodgson Russ, LLP
New York, NY
*Counsel for Defendants M&T Bank*
*Corporation and M&T Bank Corporation*
*Internal Loan Approval Committee*
*Members 1-20*

Brian Todd Belowich, Esq.
Belowich & Walsh, LLP

White Plains, NY
*Counsel for Defendant Mark Walz*

KENNETH M. KARAS, District Judge:

Plaintiffs David Germain ("Germain"), Selim Zherka ("Zherka"), Lexington Capital Associates, LLC ("Lexington Capital"), Silas Investments, LLC ("Silas Investments"), and the Zherka Family Irrevocable Trust (the "Zherka Trust") (collectively "Plaintiffs") filed the instant Amended Complaint against M&T Bank Corporation ("M&T Bank"), Mark Walz ("Walz"), and M&T Bank Corporation Internal Loan Approval Committee Members 1-20 (the "Committee Members") (collectively "Defendants"), alleging that Defendants engaged in discriminatory practices in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (the "ECOA"), the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, *et seq.* (the "FHA"), and Article 15 of the New York State Human Rights Law, New York Executive Law § 290, *et seq.* ("NYHRL"). Plaintiffs also allege that Defendants violated the notification provisions of the ECOA, conspired to interfere with Plaintiffs' civil rights in violation of 42 U.S.C. § 1985, and that Walz engaged in slander per se against Zherka. Before the Court is Defendants' Motion To Dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* First Mot. To Dismiss ("Mot.") (Dkt. No. 36).) For the following reasons, Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

#### 1. The Parties

The following facts are drawn from Plaintiffs' Amended Complaint and are taken as true for the purpose of resolving the instant Motion. Zherka is a "United States citizen of Muslim and Albanian descent." (Amended Complaint ("Am. Compl.") ¶ 6 (Dkt. No. 26).) Germain is a

mortgage banker in the business of commercial and residential mortgages and is the managing member of Lexington Capital. (*Id.* ¶ 7.) Lexington Capital is a limited liability company organized and existing under the laws of the State of New York and is involved in the business of commercial and residential mortgages with its principal place of business in New Rochelle, New York. (*Id.* ¶ 8.) Silas Investments is a limited liability company organized and existing under the laws of the State of Connecticut and is involved in the business of commercial and residential real estate, with its principal place of business in Wethersfield, Connecticut. (*Id.* ¶ 9.) The Zherka Trust is a trust that was created and exists under the laws of the State of New York, with assets that include commercial and residential real estate. (*Id.* ¶ 10.)

M&T Bank is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Buffalo, New York. (*Id.* ¶ 11.) M&T Bank is a full service bank that provides commercial retail banking services to individuals, corporations, and other businesses and institutions, and has over 700 domestic banking offices and over 2,000 ATMs in New York, Pennsylvania, Maryland, Virginia, West Virginia, and the District of Columbia. (*Id.*) M&T Bank's commercial real estate segment offers commercial real estate loans secured by various types of multi-family residential and commercial real estate properties. (*Id.*) Walz is employed as Vice President and Team Leader of M&T Bank's Commercial Real Estate Department. (*Id.* ¶ 12.) Walz "is responsible for facilitating commercial mortgage loans and selling ancillary services to real estate owners and developers who own property in the northern suburbs of New York." (*Id.* ¶ 31.) Walz is involved in loan transactions concerning investment properties, specifically, properties where the mortgage will be paid from the rents received from non-owner occupied tenants, known as "multi-family properties." (*Id.* ¶ 32.) The Committee Members are responsible for making lending decisions for M&T Bank. (*Id.* ¶ 13.)

2.  Plaintiffs' Loan Inquiries

In late October of 2011, Zherka, acting as an agent on behalf of Silas Investments and the Zherka Trust, was interested in arranging for substantial real estate financing.  (*Id.* ¶ 27.)  To arrange for such financing, Zherka contacted Germain, who informed him that M&T Bank had competitive rates and that Zherka, Silas Investments, and the Zherka Trust should do business with M&T Bank.  (*Id.* ¶ 28.)  Germain also informed Zherka that M&T Bank was comprised of lending experts who focus their efforts on lending transactions for the purposes of financing multi-family properties.  (*Id.* ¶ 29.)[1]  An employee of Lexington Capital contacted Walz on behalf of Zherka, Silas Investments, and the Zherka Trust, requesting a meeting regarding loans.  (*Id.* ¶ 30.)

Initially, Walz agreed to meet with Germain to "discuss information on a package of buildings sent to M&T Bank regarding loans [Germain] was seeking on behalf of other clients, as well as loans he was seeking on behalf of . . . Silas Investments and the [Zherka Trust]."  (*Id.* ¶ 33.)  Before the meeting, scheduled for October 19, 2011, Walz was not aware that one of Germain's clients was Zherka.  (*Id.* ¶ 34.)  The day of the meeting, Walz "abruptly cancelled the meeting upon discovering . . . Germain's association with . . . Zherka."  (*Id.*)  Plaintiffs allege that "[u]pon information and belief, had . . . Germain not disclosed his association with . . . Zherka . . . the meeting would have taken place as scheduled."  (*Id.*)  Walz never agreed to another meeting with Germain or Zherka, despite Germain's and Zherka's repeated attempts to discuss loans with M&T Bank.  (*Id.* ¶ 35.)  Accordingly, Plaintiffs never had an opportunity to

---

[1] The size of the loans in these transactions ranges from "a couple of hundred thousand dollars to a couple of hundred million dollars."  (Am. Compl. ¶ 32.)

discuss financing opportunities for multi-family properties with Walz, nor were Plaintiffs permitted to complete the loan process. (*Id.*)

As part of the application process, Germain submitted information on the proposed purchase by Silas Investments of a 37-unit residential apartment building in Westchester County. (*Id.* ¶ 36.)[2] Plaintiffs were discouraged and prevented from submitting additional information relating to that transaction and others. (*Id.*)[3]

On March 26, 2013, Walz was deposed in an unrelated matter. (*Id.* ¶ 37.)[4] During the deposition, Walz testified that Zherka was interested in meeting with him to discuss lending opportunities with M&T Bank. (*Id.*) Walz testified that he declined to meet with Zherka "because he had completed a brief google search" and the results yielded controversial headlines about Zherka that would prevent M&T Bank from approving any of Zherka's loan transactions or entertaining any loan applications made on his behalf. (*Id.* ¶ 38.) Walz also explained that M&T Bank's procedure in evaluating a potential loan applicant included meeting with a potential borrower to understand the requested loan transaction and evaluating the location of the property securing the loan, the rent roll generated by the property, tenancy, market position, cash flow generation, and the amount of excess income over the proposed debt service. (*Id.* ¶ 39.) Waltz "stated that this process applied to all potential borrowers." (*Id.* (emphasis omitted).)

M&T never evaluated Plaintiffs' application because such an evaluation was foreclosed by Walz's refusal to communicate with Germain and Zherka. (*Id.* ¶ 40.) According to Plaintiffs, Walz made a "preconceived judgment" that led him to cancel the scheduled meeting with

---

[2] The Amended Complaint does not indicate when Germain submitted this information.

[3] The Amended Complaint does not identify who discouraged Plaintiffs from submitting this additional information or how Plaintiffs were prevented from submitting the information.

[4] The Amended Complaint does not disclose the reason for the deposition.

Germain and Zherka. (*Id.* ¶ 41.) During the above-referenced deposition, Walz stated that he was under the impression that Zherka was "no good," despite not knowing anything about Zherka's real estate portfolio or that of the other Plaintiffs. (*Id.*) Walz testified that he characterized Zherka as an "Albanian with ties to the Albanian mob," specifically referring to Zherka as "a seary looking Albanian, who is a very large and intimidating man." (*Id.* ¶ 42.) Plaintiffs note that when Walz was asked during his deposition whether he ever told anyone that Zherka had a criminal history, Walz "made a nervous facial expression[,] testifying 'I don't recall ever purporting that Sam Zherka had a criminal history outside of . . . I don't ever recall purporting that.'" (*Id.* ¶ 43.) Walz could not identify another potential borrower besides Zherka that he denied meeting with as a result of an Internet search or a perception that a potential borrower "was a scary, intimidating looking Albanian man." (*Id.* ¶ 44.)

Janice Senior ("Senior"), an employee in the commercial lending department at M&T Bank, allegedly informed Zherka that she was astonished at how Zherka was treated and that such behavior was outrageous, particularly in light of M&T Bank's interest in financing multi-family properties. (*Id.* ¶ 45.) Armin Quinn Shaw ("Shaw"), another employee in the commercial lending department of M&T Bank, testified at a deposition on March 26, 2013 about the procedure that M&T Bank typically followed when engaging with a potential borrower interested in financing multi-family commercial properties. (*Id.* ¶ 46.)[5] Shaw stated that M&T Bank's procedure is to ask for the location of the property, rent rolls, and historical financial statements on the property, as well as to visit the property for which financing was sought. (*Id.* ¶ 47.) Shaw further testified that once the bank receives the requested information, a meeting

---

[5] The Amended Complaint does not offer any facts about the context in which this deposition took place.

with the prospective borrower is scheduled to discuss the financials. (*Id.*) Shaw also stated that it would be highly irregular for a banker at M&T Bank to schedule an appointment with a potential borrower and not show up. (*Id.* ¶ 48.)

On March 5, 2013, Walz and Shaw met with a private investigator purporting to be a mortgage broker at Modern Bar Restaurant in Armonk, New York. (*Id.* ¶ 49.)[6] During the meeting, Walz told the private investigator that he would not do business with Zherka because he was "no good" and alluded that Zherka had ties to the Albanian mob. (*Id.*) The private investigator asked Walz whether Walz would be willing to engage in multi-family loan transactions with another potential client, "Mr. C," a white male who had been arrested on multiple occasions. (*Id.* ¶ 50.) Walz stated that M&T Bank "would love to get our arms around [Mr. C's multi-family loan transactions]" and asked the private investigator to send him information pertaining to Mr. C's properties. (*Id.*)

Plaintiffs allege that M&T Bank knew or had reason to know of Walz's unlawful discrimination. (*Id.* ¶ 51.) On October 19, 2011, in a phone conversation between Walz and Germain, Walz characterized Zherka as an Albanian gangster and stated, "These people are all criminals." (*Id.* ¶ 51.) Walz further stated that he was advised by M&T Bank to stay clear of Zherka because he had a long criminal history, was involved in selling illegal drugs, and had Albanian organized crime ties. (*Id.*) On the same day, Walz informed Zherka that the Committee Members would never approve his loan, stating that the Committee Members would say "the real estate looks good; the cash flow looks good; the loan to value ratio looks good; but because it's Sam Zherka, they will recommend against it." (*Id.* ¶ 52.) When Zherka asked Walz

---

[6] The Amended Complaint does not provide any details about who hired the private investigator or why.

for an explanation for the cancellation of the scheduled meeting, Walz claimed that he was told to "cancel the meeting and push it off until they stop calling." (*Id.*)

### 3. Allegations of M&T Bank's Discriminatory Policies

Plaintiffs allege that M&T Bank "maintained formal and/or informal policies of discriminatory conduct against Muslims." (*Id.* ¶ 53.) Specifically, Plaintiffs claim that various employees of M&T Bank, including managers and other individuals in leadership positions, have made numerous statements to Zherka expressing anti-Muslim sentiment. (*Id.*) In December 2013, Peter Sestito ("Sestito"), a manager of M&T Bank in North Salem, New York, met with Zherka "who at the time was presenting himself as someone other than an Albanian of Muslim descent." (*Id.* ¶ 54.)[7] Sestito made various statements expressing anti-Muslim sentiment, including the statement that M&T Bank "overscrutinizes Muslim loan applicants." (*Id.*) These statements were confirmed by other employees of M&T Bank. (*Id.*) On or about December 6, 2013, Lisa Eccavaria ("Eccavaria"), a Vice President of M&T Bank in Middletown, New York, and Eileen Mershon ("Mershon"), a manager of M&T Bank in Roscoe, New York, met with Zherka "who at the time was presenting himself as someone other than an Albanian of Muslim descent." (*Id.* ¶¶ 55–56.) Eccavaria and Mershon also made various statements expressing anti-Muslim sentiment, including the statement that M&T Bank "overscrutinizes Muslim loan applicants." (*Id.* ¶¶ 55–56.) Finally, Plaintiff alleges that on or about December 11, 2013, Deborah White ("White"), a manager of M&T Bank in Cold Spring, New York, met with Zherka. (*Id.* ¶ 57.) White made various statements expressing anti-Muslim sentiment, including the statement that M&T Bank does not do business with Muslims and "overscrutinizes Muslim loan applicants." (*Id.*) White further stated that there was a Muslim who recently applied for a

---

[7] It is worth noting that the Amended Complaint does not allege in any way that Defendants were ever aware of Zherka's religion.

8

loan and who met all of the criteria for approval as set forth in a recent employee training, but M&T Bank denied the application because the loan officer was uncomfortable with the applicant's religious affiliation. (*Id.*)

### B. Procedural History

Plaintiffs filed the original Complaint on October 16, 2013. (Dkt. No. 1.) Plaintiffs filed the Amended Complaint on April 8, 2014, alleging violations of the ECOA, the FHA, 42 U.S.C. § 1985, NYHRL, and slander per se. (Dkt. No. 26.) Pursuant to a scheduling order adopted at a pre-motion conference held before the Court on June 12, 2014, (Dkt. No. 33), Defendants filed their Motion To Dismiss and supporting papers on July 14, 2014, (Dkt. Nos. 36–38), Plaintiffs filed their opposition papers on August 16, 2014, (Dkt. Nos. 39–40), and Defendants filed their reply on September 5, 2014, (Dkt. No. 42).

## II. Discussion

### A. Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)); *see also Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same), *aff'd*, 591 F. App'x 28 (2d Cir. 2015). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation marks omitted); *see also Seemann v. U.S. Postal Serv.*, No. 11-CV-206, 2012 WL 1999847, at *1 (D. Vt. June 4, 2012) (same). However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes

9

the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction

exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule

12(b)(6)." *Gonzalez*, 2014 WL 2475893, at \*2; *see also Sobel v. Prudenti*, 25 F. Supp. 3d 340,

352 (E.D.N.Y. 2014) ("In contrast to the standard for a motion to dismiss for failure to state a

claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of

proving by a preponderance of the evidence that it exists." (internal quotation marks omitted)).

This difference as to the allocation of the burden of proof is "[t]he only substantive difference"

between the standards of review under these two rules. *Smith v. St. Luke's Roosevelt Hosp.*, No.

08-CV-4710, 2009 WL 2447754, at \*9 n.10 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 WL

2878093 (S.D.N.Y. Sept. 2, 2009); *see also Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F.

Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009) (same).

### 1. Rule 12(b)(1)

"'A federal court has subject matter jurisdiction over a cause of action only when it has

authority to adjudicate the cause pressed in the complaint.'" *Bryant v. Steele*, 25 F. Supp. 3d

233, 241 (E.D.N.Y. 2014) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated

and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)).

"Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is

properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district

court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank

Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247

(2010); *see also N.Y. State Citizens' Coal. for Children v. Carrion*, 31 F. Supp. 3d 512, 516

(E.D.N.Y. 2014) (same).  Nevertheless, "[u]nlike Article III standing, which ordinarily should be

determined before reaching the merits, statutory standing may be assumed for the purposes of

deciding whether the plaintiff otherwise has a viable cause of action." *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006). While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (brackets and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2. Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, internal quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (internal quotation marks and alterations omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by

reference," as well as "matters of which judicial notice may be taken, and documents either in

plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."

*Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n. 1 (2d

Cir. 2014) (brackets and internal quotation marks omitted); *see also Leonard F. v. Isr. Disc.

Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district

court must confine its consideration to facts stated on the face of the complaint, in documents

appended to the complaint or incorporated in the complaint by reference, and to matters of which

judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of New York*,

No. 12–CV–5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

### B.  FHA Claims

In their fifth and eighth causes of action, Plaintiffs claim that Defendants discriminated

against them based on religion, in violation of the FHA.  (Am. Compl. ¶¶ 98–110, 138–150.)  In

their sixth and seventh causes of action, Plaintiffs claim that Defendants discriminated against

them based on national origin, in violation of the FHA.  (*Id.* ¶¶ 111–37.)

#### 1.  Applicable Law

Enacted as Title VIII of the Civil Rights Act of 1968, the FHA "bar[s] discrimination in

housing on the basis of race, color, religion, or national origin," among other protected classes.

*Williams v. N.Y.C. Hous. Auth.*, 879 F. Supp. 2d 328, 334 (E.D.N.Y. 2012) (quoting *Schwarz v.

City of Treasure Island*, 544 F.3d 1201, 1212 (11th Cir. 2008) (internal quotation marks

omitted)).  The purpose of the FHA is "to provide, within constitutional limitations, for fair

housing throughout the United States."  42 U.S.C. § 3601.  As relevant here, the FHA makes it

"unlawful for any person or other entity whose business includes engaging in real estate-related

transactions to discriminate against any person in making available such a transaction, or in the

terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a).  The FHA defines such "residential real estate-related" transactions as "(1) [t]he making or purchasing of loans or providing other financial assistance—(A) for purchasing, constructing, improving, or maintaining a dwelling; or (B) secured by residential real estate," as well as "(2) [t]he selling, brokering, or appraising of residential real property."  *Id.* § 3605(b).

The Second Circuit has yet to decide the pleading requirements of a claim under § 3605. One district court in the Second Circuit has explained that to state a claim under § 3605, the plaintiff must plead (1) that []he is a member of a protected class; (2) that []he attempted to engage in a real estate-related transaction and met all relevant qualifications for doing so; (3) that the defendant refused to transact business with [him] despite his qualifications; and (4) that the defendant[] continued to engage in the type of transaction in question with other parties with similar qualifications."  *Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 289 (N.D.N.Y. 2008) (internal quotation marks omitted), *aff'd*, 421 F. App'x 97 (2d Cir. 2011) .[8]

### 2. Application

Defendants argue that Plaintiffs cannot sustain a claim under the FHA because "Plaintiffs sought to discuss lending with Defendants as a purely commercial venture."  (Mem. of Law in Supp. of Defs.' M&T Bank Corporation, Mark Walz, and M&T Bank Corporation Internal Loan Approval Committee Members 1-20's Mot. To Dismiss the Am. Compl. ("Defs.' Mem.") 9 (Dkt.

---

[8] It is worth noting that "[t]he Supreme Court has repeatedly directed the courts to give a generous construction to the Fair Housing Act."  *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 87 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

No. 37).) Stated differently, Defendants contend that because Plaintiffs attempted to obtain financing for a property that they did not intend to reside in, but rather rent to other individuals, Plaintiffs have no cause of action for discrimination under the FHA.

The Second Circuit has not decided whether a plaintiff may bring a claim under the FHA based on the alleged discrimination against an individual who seeks to purchase a residential property for commercial purposes only. Courts have held, or otherwise acknowledged, that a plaintiff may state a cause of action under the FHA if he or she has attempted to develop or finance a residential property, and the defendant has "engaged in unlawful discrimination against a person or class of persons who reside or would reside in the dwelling absent the unlawful discrimination." *Home Quest Mortg. LLC v. Am. Family Mutual Ins. Co.*, 340 F. Supp. 2d 1177, 1185 (D. Kan. 2004); *see also Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1103 (3d Cir. 1996) (holding that a developer of a proposed nursing home stated a claim under § 3604(f)(1) of the FHA based on allegations that the defendants discriminated against the elderly people that would be living there); *Mitchell v. Citizens Bank*, No. 10-CV-569, 2011 WL 101688, at *2 (M.D. Tenn. Jan. 11, 2011) ("For a[n] FHA claim, the commercial property owner must allege that the defendant engaged in unlawful discrimination against a person or class of persons who reside or would reside in the dwelling absent the unlawful discrimination." (internal quotation marks omitted)). In other words, these courts have held or suggested that if a developer were to bring an FHA claim because a defendant has engaged in discrimination against prospective residents, the developer would have a cause of action under the Act. This reasoning comports with the FHA's purpose to provide "for fair housing throughout the United States." 42 U.S.C. § 3601. In this case, however, there are no allegations that suggest that Defendants engaged in discrimination against the residents who would have lived at Plaintiffs' planned property.

Indeed, the Amended Complaint makes no reference to the residents who would rent the dwellings, but only alleges that the buildings would be "properties where the mortgage [would] be paid from the rents received from non-owner occupied tenants, also known as 'multi-family properties,'" (Am. Compl. ¶ 32), and that one building was a "37[-]unit residential apartment building in Westchester County," (*Id.* ¶ 36). The Court need not, then, decide whether a plaintiff would have a cause of action under the FHA if he or she alleges that a defendant has engaged in discrimination directed at prospective residents, because here Plaintiffs base their claim on discrimination allegedly directed at Zherka because of his religion and national origin.

Absent allegations that suggest a defendant engaged in discrimination against the residents or intended residents of a property, courts have rejected the notion that a plaintiff may state a claim under the FHA for discrimination based on a commercial transaction. *See Home Quest Mortg. LLC*, 340 F. Supp. 2d at 1188 (explaining that the plaintiff who "owned the [relevant] building purely as a commercial endeavor," "never intended to inhabit the . . . residential rental unit," and was "not asserting discrimination claims on behalf of anyone who lived in or sought to live in th[e] unit" failed to state a claim under the FHA); *Mitchell*, 2011 WL 101688, at *2 (holding that the plaintiff "failed to state a claim under the FHA because he owned the property as a commercial venture" and he was not alleging that the defendant discriminated against any of the tenants); *cf. Brown v. Interbay Funding, LLC*, 417 F. Supp. 2d 573, 579 (D. Del. 2006) ("Since it is undisputed that the property in issue was zoned commercial and that plaintiffs intended to use it for a commercial purpose, plaintiffs' claims under the FHA must fail."). The Court agrees with these decisions for the reasons below.

To begin, the fact that Plaintiffs ultimately sought to finance a residential property does not automatically trigger the protections of the FHA. "The FHA applies only to 'residential real

16

estate-related transactions,' not all activities related to residential real estate-related transactions." *Jordan v. Chase Manhattan Bank*, No. 13-CV-9015, 2015 WL 1000058, at *8 (S.D.N.Y. Mar. 6, 2015); *cf. Ghoram-DiMaggio v. Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 290 (N.D.N.Y. 2008) ("Under [the] plain language of the statute, 'financial assistance' means providing prospective purchasers with financing information to help them purchase or rent a home."). The pertinent inquiry, then, is whether Plaintiffs' attempted transaction constituted a "residential real estate-related transaction" within the meaning of § 3605.

As noted above, § 3605 prohibits discrimination in a "residential real estate-related transaction," defined as "(1) [t]he making or purchasing of loans or providing other financial assistance—(A) for purchasing, constructing, improving, or maintaining a *dwelling*; or (B) secured by *residential* real estate," as well as "(2) [t]he selling, brokering, or appraising of *residential* real property." 42 U.S.C. § 3605(b) (emphasis added). In this case, Plaintiffs allege that the discrimination they suffered related to the loans that they sought. Accordingly, the first subsection of § 3605(b) applies, and the pertinent question is whether Plaintiffs' transaction was an attempt to obtain financial assistance for the purchase of a dwelling or residence within the meaning of the Act.

Although not directly on point, cases that have analyzed what constitutes a dwelling or residence for the purpose of the FHA are helpful to determine if the transaction here is covered by § 3605. The FHA defines dwelling as:

> any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

42 U.S.C. § 3602(b). Moreover, although the FHA does not define residence, "[m]ost courts that have considered the scope of the term have relied on the definition used in *United States v.*

17

*Hughes Memorial Home*, 396 F. Supp. 544 (W.D. Va. 1975), which is 'a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit.'" *Hunter on Behalf of A.H. v. District of Columbia*, —F. Supp. 3d—, 2014 WL 4071333, at *12 (D.D.C. Aug. 18, 2014) (quoting *Hughes Memorial Home*, 396 F. Supp. at 549); *see also United States v. Columbus Country Club*, 915 F.2d 877, 881 (3d Cir. 1990) (same); *Jenkins v. N.Y.C. Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 517–18 (S.D.N.Y. 2009) ("In determining if the shelter was a 'dwelling,' . . . most courts have cited the . . . defin[ition] [of] residence as a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit" (citing *Hughes Memorial Home*, 356 F. Supp. at 548–49)); *Tara Circle, Inc. v. Bifano*, No. 95-CV-6522, 1997 WL 399683, at *15 (S.D.N.Y. July 15, 1997) (explaining that "the Act does not define 'residence' and the Second Circuit has not addressed the issue," and relying on the Third Circuit's holding in *United States v. Columbus Country Club*, 915 F.2d 887 (3d Cir. 1990) that "'residence' should take on its plain meaning").

Considering these definitions, the Third Circuit has held that "two factors determine whether a specific facility is a dwelling under the [FHA:] . . . [1] whether the facility is intended or designed for occupants who 'intend to remain in the facility for any significant period of time' . . . . [and] [2] whether those occupants would 'view the facility as a place to return to' during that period." *Lakeside Resort Enters., LP v. Bd. of Sup'rs of Palmyra Tp.*, 455 F.3d 154, 158 (3d Cir. 2006) (quoting *Columbus Country Club*, 915 F.2d at 881) (brackets omitted). The Eleventh Circuit has also relied on these principles to evaluate whether a structure falls within the FHA's protection. *See Schwarz*, 544 F.3d at 1215 (explaining that "(1) the more occupants treat a building like their home—e.g., cook their own meals, clean their own rooms and maintain the

18

premises, do their own laundry, and spend free time together in common areas—the more likely that it is a 'dwelling'; and (2) the longer the typical occupant lives in a building, the more likely it is that the building is a 'dwelling'" (italics omitted)).

Based on these definitions and criteria, and the decisions of the courts that have applied them, it is clear that in determining whether a particular building is a dwelling or residence, the focus is on whether the individuals that are subject to discrimination use or intend to use the building as a dwelling or residence. *See Hovsons*, 89 F.3d at 1102 (holding that "to the handicapped elderly persons who would reside there . . . [the nursing home] would be their home, very often for the rest of their lives."); *Jenkins*, 643 F. Supp. 2d at 518 (explaining that the "homeless shelter to which [the plaintiff] was denied entry could fall well within the definition of dwelling under the FHA" because the plaintiff "intend[ed] to stay at the shelter as long as he [could], . . . and [he had] no other home to go to"); *Tara*, 1997 WL 399683, at *16 (holding that a dormitory was not a residence because the plaintiff used the dormitory on four separate occasions for four to seven days between a period of about a year and a half). In other words, the determination of whether a particular building is a dwelling or residence within the meaning of the FHA does not turn on fixed classifications of the building—e.g., a homeless shelter is or is not a residence, or a dormitory is or is not a residence—but instead courts analyze the function of a specific building for a particular plaintiff alleging discrimination under the Act. This analysis comports with the purpose of the FHA, which, as noted above, is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601; *see also Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 392 (S.D.N.Y. 2012) (same).

Applying these principles, the Court concludes that Plaintiffs' transaction, at least absent allegations that the discrimination Defendants engaged in was directed at prospective residents of

the property, does not qualify as a "residential real estate-related transaction." Plaintiffs allege

that they intended to apply for a loan in M&T Bank's commercial real estate lending department

for "multi-family properties" on behalf of Silas Investments and the Zherka Trust. (Am. Compl.

¶¶ 26–27.) As noted above, merely because Plaintiffs sought financing for a type of property

that would house residents does not make the transaction a "[r]esidential real estate-related

transaction" as defined in the Act. Rather, as applicable here, the transaction must be related to

the "making or purchasing of loans or providing other financial assistance—for purchasing . . . a

dwelling." 42 U.S.C. § 3605(b)(1)(A). Based on the reasoning of the cases discussed above, a

property, in turn, qualifies as a dwelling if those alleging or otherwise affected by the

discrimination "[1] . . . 'intend[ed] to remain in the facility for any significant period of

time' . . . [and] [2] 'view[ed] the facility as a place to return to' during that period." *Lakeside*

*Resort Enters., LP*, 455 F.3d at 158 (quoting *Columbus Country Club*, 915 F.2d at 881)

(alterations omitted). Plaintiffs do not allege that they "intend[ed] to remain in the [property] for

any significant period of time" or would otherwise consider it a dwelling or residence for

themselves. Rather, the Amended Complaint defines the "multi-family properties" as

"properties where the mortgage [would] be paid from the rents received from non-owner

occupied tenants." (Am. Compl. ¶ 32.) Accordingly, § 3605 does not apply to the transaction

alleged in the Amended Complaint because Plaintiffs' purpose in applying for the loan was

commercial, rather than residential, and the discrimination that they allege is directed at them as

commercial applicants, rather than at the prospective residents of the property. *See Home Quest*

*Mortg. LLC*, 340 F. Supp. 2d at 1188 (explaining that because "§ 3605 by its plain terms applies

only to a 'dwelling' or 'residential real estate'" and "[a]lthough [the plaintiff] allegedly suffered

gender discrimination at the hands of the defendants, that discrimination did not occur in

conjunction with a dwelling or residential transaction insofar as she was concerned"). The transaction alleged here is thus outside of the scope of the FHA, and accordingly, Plaintiffs' FHA claim is dismissed.[9]

### C. ECOA and NYHRL Claims

In their first, second, and tenth causes of action, Plaintiffs allege that they were discriminated against in violation of the ECOA and NYHRL based on religion and national origin. (Am. Compl. ¶¶ 58–81, 165–74.) Plaintiffs also assert causes of action under the ECOA for Defendants' failure to provide them with notification that their application for credit had been denied. (*Id.* ¶¶ 82–97.)

#### 1. Applicable Law

The "ECOA provides that it is 'unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction[,] . . . on the basis of race, color, religion, national origin, sex or marital status, or age." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting 15 U.S.C. § 1691(a)). Similarly, the NYHRL § 296-a(1)(b) provides that it shall be an unlawful discriminatory practice for "any creditor or any officer, agent[,] or employee thereof . . . [t]o discriminate in the granting, withholding, extending[,] or renewing, or in the fixing of the rates, terms, or conditions of, any form of credit, on the basis of . . . national origin." *See also New York State Div. of Human Rights v. H&R Block Tax Servs., Inc.*, 897 N.Y.S.2d 75, 75 (App. Div. 2010) (same). Because § 296-a is the state counterpart to the ECOA, the Court will consider the discrimination claims under these statutes together. *See Clearing House Ass'n, L.L.C. v. Cuomo*, 510 F.3d 105, 109 & n.3 (2d Cir. 2007), *reversed in part on other grounds by* 557 U.S. 519 (2009).

---

[9] Of course, that Plaintiffs may have been the subject of discrimination could be addressed by other statutes.

Under the ECOA, "[t]he term 'credit transaction' encompasses 'every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit . . . .'" *AMS Grp. v. JP Morgan Chase Bank*, No. 07-CV-6988, 2008 WL 3833848, at *2 (S.D.N.Y. Aug. 15, 2008) (quoting 12 C.F.R. § 202.2(m)), *aff'd*, 371 F. App'x 149 (2d Cir. 2010). Moreover, "'[c]redit' has a particular meaning under [the ECOA], namely 'the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor.'" *Chizh v. Polish & Slavic Fed. Credit Union*, No. 10-CV-1505, 2011 WL 2680495, at *3 (E.D.N.Y. July 8, 2011) (quoting 15 U.S.C. § 1691b(a)). An "applicant" for credit, in turn, is defined as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b); *see also Chizh*, 2011 WL 2680495, at *3 (same).

"Congress mandated that the agency charged with overseeing ECOA—first the Federal Reserve, now the Consumer Financial Protection Bureau—promulgate regulations 'to carry out the [statute's] purposes.'" *RL BB Acquisition, LLC v. Bridgemill Commons Dev'pt Grp, LLC*, 754 F.3d 380, 383 (6th Cir. 2014) (quoting 15 U.S.C. § 1691b(a)). "Regulation B is the result of Congress's directive." *Id.* According to Regulation B, an "application" is defined as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." 12 C.F.R. § 202.2(f).

Under the ECOA, Plaintiffs may bring suit for acts motivated by discriminatory intent or for policies that have a discriminatory impact. *See M&T Mortgage v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010) ("ECOA claims may be prosecuted on the basis of . . . disparate treatment . . . or on the basis of . . . disparate impact"); *Powell v. Am. Gen. Fin., Inc.*, 310 F.

Supp. 2d 481, 487 (N.D.N.Y. 2004) (same); *Burrell v. State Farm Fire & Cas. Co.*, No.

00-CV-5733, 2001 WL 797461, at *9 (S.D.N.Y. July 12, 2001) (same).[10]  The Second Circuit

has not addressed what a plaintiff must allege to state a claim based on disparate treatment under

the ECOA.  *See Gunter v. Long Island Power Authority/Keyspan*, No. 08-CV-498, 2011 WL

1225791, at *5 (E.D.N.Y. Feb. 15, 2011), *adopted by* 2011 WL 1154832 (E.D.N.Y. Mar. 29,

2011).  Nevertheless, district courts in the Second Circuit have "applied the Title VII burden-

shifting analysis [established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973)] to ECOA claims."  *Id.*; *see also Powell*, 310 F. Supp. 2d at 487 ("Courts

analyze disparate treatment claims under the ECOA in the same manner as Title VII employment

cases"); *Gross v. U.S. Small Business Admin.*, 669 F. Supp. 50, 52 (N.D.N.Y. 1987) (same).

"Under *McDonnell Douglas*, [the] plaintiff bears the initial burden of proving by a

preponderance of the evidence a prima facie case of discrimination."  *Heyman v. Queens Vill.*

*Cmty. for Mental Health for Jamaica Comm. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir.

1999) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).  "The burden

of production then shifts to [the defendant], who must offer through the introduction of

admissible evidence a non-discriminatory reason for [its] actions that, if believed by the trier of

fact, would support a finding that unlawful discrimination was not a cause of the disputed

employment action."  *Id.*  If the defendant meets this burden, the plaintiff "then must show that

the proffered reason was merely a pretext for discrimination, which may be demonstrated by the

presentation of additional evidence showing that the employer's proffered explanation is

---

[10] "To establish a prima facie case under a disparate impact theory, a plaintiff must
identify a specific policy or practice which the defendant has used to discriminate and must also
demonstrate with statistical evidence that the practice or policy has an adverse effect on the
protected group."  *Powell*, 310 F. Supp. 2d at 487 (italics omitted).  Here, however, Plaintiffs
only assert a claim under a theory of disparate treatment.

unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Id.* (internal quotation marks omitted).

District courts in the Second Circuit have stated that to establish a prima facie case under the ECOA, the plaintiff must demonstrate that: "(1) [he] was a member of a protected class, (2) [he] applied for credit from [the] defendant, (3) [he] was qualified for credit but [the] defendant denied [his] credit application, and (4) [the] defendant continued to engage in the type of transaction in question with other parties with similar qualifications." *Gunter*, 2011 1225791, at *5; *see also Griffin v. Santander Bank*, No. 12-CV-1249, 2014 WL 204229, at *7 (E.D.N.Y. Jan. 16, 2014) (same); *Powell*, 310 F. Supp. 2d at 487 (same); *cf. Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) ("Plaintiffs may establish a prima facie case of housing discrimination by showing that (1) they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers.").

"In addition to its anti-discrimination provisions, ECOA also 'establishes procedural requirements for extending credit and communicating with applicants.'" *Stoyanovich v. Fine Art Cap. LLC*, No. 06-CV-13158, 2007 WL 2363656, at *2 (S.D.N.Y. Aug. 17, 2007) (quoting *Davis v. U.S. Bancorp*, 383 F.3d 761, 766 (8th Cir. 2004)). Section 1691(d) requires that "[e]ach [credit] applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor" which may be satisfied by either "providing statements of reasons in writing" or "giving written notification of adverse action" that "discloses . . . the applicant's right to a statement of reasons" and "the identity of the person or office from which such statement may be obtained." 15 U.S.C. § 1691(d). The ECOA defines "adverse action" as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a

refusal to grant credit in substantially the amount or on substantially the terms requested." *Id.* § 1691(d)(6). "Although a creditor 'may inform the applicant orally of the need for additional information,' 'if the application remains incomplete, the creditor shall send' written notice of the incompleteness or denial." *Gunter v. Long Island Power Auth./Keyspan*, No. 08-CV-498, 2012 WL 4057410, at *4 (E.D.N.Y. Aug. 8, 2012) (quoting 12 C.F.R. § 202.9(c)(3)). To prevail on an ECOA notice claim, a plaintiff must prove that: "(1) [the defendant] is a creditor; (2) [the plaintiff] is a loan applicant, (3) [the defendant] took adverse action with respect to [the plaintiff's] credit application, and (4) [the defendant] failed to provide the plaintiff with an ECOA-compliant notice of its adverse action." *See Stoyanovich*, 2007 WL 2363656, at *2 (citing *Madrigal v. Kline Oldsmobile, Inc.*, 423 F.3d 819, 822 (8th Cir. 2005)).

### 2. Application

#### a. Standing

Defendants first argue that Plaintiffs' claims under the ECOA should be dismissed pursuant to 12(b)(1) because Plaintiffs do not have standing.

"Standing is . . . analyzed both in terms of constitutional—or Article III—standing as well as statutory standing." *Chenkin v. 808 Columbus LLC*, 570 F. Supp. 2d 510, 515 (S.D.N.Y. 2008) (citing *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 84 (2d Cir. 2006)). To satisfy Article III's standing requirements, Plaintiffs must show that (1) they have "'suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) (some internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (same); *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir. 2008) (same). Statutory standing, in turn, is "broadly described as part of the prudential considerations regarding the proper limits of jurisdiction." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 126 (2d Cir. 2003). To have statutory standing "a plaintiff's complaint [must] fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (internal quotation marks omitted); *see also Sullivan v. Syracuse Hous. Auth.*, 962 F.2d 1101, 1106 (2d Cir. 1992) ("[T]he interest asserted by the plaintiff should be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (internal quotation marks omitted)). The zone-of-interests test "seeks to determine whether . . . the plaintiff is within the class of persons sought to be benefitted by the provision at issue." *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003).

Defendants do not challenge that Plaintiffs have Article III standing. Instead, Defendants argue that Plaintiffs Germain, Lexington Capital, Zherka, and the Zherka Trust do not have statutory standing because they are not "applicants" within the meaning of the ECOA and, thus, do not fall within the "zone of interests" that Congress meant to protect in enacting the statute. (Defs.' Mem. 15–16.) In other words, Defendants argue that Silas Investments was the only potential applicant for credit and, therefore, the only Plaintiff that has standing under the ECOA. (*See* Defs.' M&T Bank Corporation, Mark Walz, and M&T Bank Corporation Internal Loan Approval Committee Members 1-20 Reply to Pls.' Mem of Law in Opp'n to Defs.' Mot. To Dismiss and In Further Supp. of Their Mot. To Dismiss ("Defs.' Reply") 7 (Dkt. No. 42).)

In enacting the ECOA, Congress meant to protect applicants for credit from

discrimination. *See Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 754 (6th Cir. 2014) ("The ECOA prohibits creditors from discriminating against any credit applicant 'with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex, or marital status.'" (quoting 15 U.S.C. § 1691(a)(1)); *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 975 (7th Cir. 2004) ("The ECOA was originally enacted in 1974 to prohibit discrimination in credit transactions."); 12 C.F.R. § 1002.1 ("The purpose of this part is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age . . . ."). Accordingly, "only 'applicants' have the ability to sue for ECOA violations." *RL BB Acquisition, LLC*, 754 F.3d at 384; *see also F.D.I.C. v. 32 Edwardsville, Inc.*, 873 F. Supp. 1474, 1480 n.2 (D. Kan. 1995) (same); *cf. Evans v. First Fed. Sav. Bank of Indiana*, 669 F. Supp. 915, 922 (N.D. Ind. 1987) ("The[] statutory provisions [under the ECOA] clearly indicate that Congress meant to protect those individuals who actually apply for credit.").

As noted above, an "applicant" for credit is defined under the ECOA as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). Regulation B, in turn, provides that an "applicant" is "any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may become contractually liable regarding an extension of credit." 12 C.F.R. § 1002.2(e). Moreover, a "person" means, among other things, "a natural person, corporation, . . . [or] trust." *Id.* § 1002.2(x).

The Court agrees with Defendants that based on the allegations in the Amended Complaint, Germain and Lexington Capital are not "applicants" within the meaning of the

ECOA. "To 'apply' means 'to make an appeal or request esp[ecially] formally and often in writing and usu[ally] for something of benefit to oneself." *Hawkins v. Cmty. Bank of Raymore*, 761 F.3d 937, 941 (8th Cir. 2014) (alterations in original) (quoting Webster's Third New International Dictionary 105 (2002)). Although an employee of Lexington Capital requested a meeting to discuss loans, the Plaintiffs allege that the request was made on behalf of Zherka, Silas Investments, and the Zherka Trust. (Am. Compl. ¶ 30.) Plaintiffs allege that Walz "initially agreed to a meeting . . . with Germain to discuss information on a package of buildings sent to . . . M&T Bank regarding loans [that Germain] was seeking on behalf of other clients, as well as loans he was seeking on behalf of . . . Silas Investments and The Zherka . . . Trust." (*Id.* ¶ 33.) In other words, Germain attempted to discuss the potential applications of Zherka, Silas Investments, and the Zherka Trust and other clients, but was not intending to discuss his own application or that of his own company, Lexington Capital. Moreover, there are no allegations that Walz or Lexington Capital may have "become contractually liable regarding an extension of credit." 12 C.F.R. § 1002.2(e). Finally, Plaintiffs point to no cases where a mortgage banker or his or her firm was deemed to have standing to pursue ECOA discrimination claims on behalf of their clients, and the Court has not found any.[11] Accordingly, based on the purpose of the ECOA to protect applicants of credit from discrimination, the definition of "applicant" in the Act as further explained in the regulations, and the allegations in the Amended Complaint that Germain, as president of Lexington Capital, requested a meeting to discuss credit on behalf of Zherka, Silas Investments, and the Zherka Trust, the Court concludes that Germain and Lexington

---

[11] In contrast, courts have found that a mortgage broker that helped arrange financing for the plaintiff qualified as a "creditor" for the purposes of analyzing the plaintiff's ECOA claims because the mortgage broker "participated in the decision to grant or deny credit." *Jefferson v. Briner Inc.*, No. 05-CV-652, 2006 WL 1720692, at *5 (E.D. Va. June 21, 2006); *see also Dinoto v. Rockland Fin. Mortg. Co., LLC*, No. 06-CV-1132, 2007 WL 2460674, at *2 (D. Conn. Aug. 2, 2007) (same), *adopted by* 2007 WL 2667318 (D. Conn. Aug. 21, 2007).

Capital do not have statutory standing because they are not within the zone of interests that the ECOA protects. Germain's and Lexington Capital's ECOA claims are, therefore, dismissed.

As to Zherka and the Zherka Trust, the Amended Complaint alleges facts to suggest that they intended to apply for credit and, therefore, were potential applicants within the meaning of the Act. Specifically, Zherka contacted German about arranging for substantial real estate financing. (Am. Compl. ¶ 28.) An employee of Lexington Capital then contacted Walz on behalf of Zherka, Silas Investments, and the Zherka Trust, requesting a meeting regarding loans. (*Id.* ¶ 30.) Plaintiffs state that because of Walz's refusal to meet with them they never had an opportunity to discuss their loan or "complete the loan process." (*Id.* ¶ 35.) Although the Plaintiffs allege that "[a]s part of the application process . . . Germain submitted information on the proposed purchase by Silas Investments . . . of a 37[-]unit residential apartment building in Westchester County," (*id.* ¶ 36), it is not clear that Silas Investments was the sole applicant for a loan to finance the property. Further, Plaintiffs allege that they were "discouraged and prevented from submitting additional information relating to that transaction and others." (*Id.*) In other words, it is not clear from the Amended Complaint that Zherka and the Zherka Trust have no plausible claim under the ECOA on standing grounds because, as explained more fully below, the allegations may be read to assert that Zherka and the Zherka Trust intended to apply for credit on behalf of themselves to finance Silas Investments' purchase of the residential apartment building in Westchester County.

"The overlap of merits and standing issues often arises in challenges to statutory standing like the one raised by [Defendants] here, which 'has nothing to do with whether there is a case or controversy under Article III.'" *Sik Gaek, Inc. v. Yogi's II, Inc.*, No. 10-CV-4077, 2013 WL 2408606, at *6 (E.D.N.Y. June 3, 2013) (quoting *Steel Co. v. Citizens for a Better Environ.*, 523

U.S. 83, 97 (1998)); *see also Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436
F.3d 82, 87 (2d Cir. 2006) ("In some cases, an issue of statutory standing may be closely related
to, if not inextricably entwined with, an issue on the merits."). While, "[i]t is clear that
constitutional standing is a jurisdictional prerequisite to suit," *Lerner*, 318 F.3d at 126, "courts
may determine whether a cause of action exists under a given statute, an issue of statutory
construction that goes to the merits of the action, before addressing the zone-of-interests
prudential dimension of standing," *id.* at 127 (citing *Steel Co.*, 523 U.S. at 97).

Here, the Court concludes that Defendants' challenge to the standing of Zherka and the
Zherka Trust to sue under the ECOA because they are not "applicants" is better addressed by
evaluating whether these Plaintiffs have sufficiently alleged that they intended to apply for a
loan. *See Alliance for Envtl. Renewal, Inc.*, 436 F.3d at 87–88 ("[O]nce the [d]efendants' motion
to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) put the Plaintiffs' Article III
standing in issue, the District Court has leeway as to the procedure it wishes to follow."
(footnotes omitted)). Indeed, to establish a claim of discrimination under the ECOA, a plaintiff
must ultimately demonstrate that he or she is an applicant within the meaning of the statute. *See
Griffin*, 2014 WL 204229, at *7 (explaining that a plaintiff must demonstrate, among other
things, that he or she "'applied for credit from defendant'") (quoting *Gunter*, 2011 WL 1225791,
at *4); *Chizh*, 2011 WL 2680495, at *4 ("[A] plaintiff must be an 'applicant' for 'credit,'
because, as the Second Circuit has held, 'absent a right to defer payment for a monetary debt,
property or services, the ECOA in inapplicable.'" (quoting *Shaumyan v. Sidetex Co.*, 900 F.2d
16, 18 (2d Cir. 1990)). Further, the Court notes that it has not found any cases in the Second
Circuit that have dismissed a claim under the ECOA on standing grounds based on the
defendant's claim that the plaintiff is not the actual applicant. Instead, courts in the Second

Circuit have addressed challenges to whether the plaintiff is an "applicant" within the meaning of the Act through the lens of a failure to state a claim under Rule 12(b)(6). *See Gorham-DiMaggio*, 592 F. Supp. 2d at 291 (dismissing the plaintiff's claim under the ECOA for failure to state a claim because the plaintiff "was not an applicant within the plain meaning of the ECOA, and therefore can not invoke the protections of the Act"); *Powell*, 310 F. Supp. 2d at 487 (explaining that "[a]lthough [the] [d]efendant . . . alleges that [the] [p]laintiff did not, in fact, apply to it for credit, such an argument attacks the viability of [the] [p]laintiff's claim, which [was] not at issue in th[e] motion," and "[a]ccordingly, the [c]ourt deni[ed] [the] [d]efendant's . . . motion to dismiss to the extent that it is based upon [the] [p]laintiff's lack of standing"); *see also Griffin*, 2014 WL 204229, at *7 (recommending dismissal of the plaintiff's ECOA claim on Rule 12(b)(6) grounds because "[n]owhere does [the] plaintiff allege that he applied for credit from defendant, was qualified for credit, and was denied said credit"). The Court, therefore, turns to whether Zherka, the Zherka Trust, and Silas Investments state a claim to survive a motion to dismiss pursuant to Rule 12(b)(6).

### b. Discrimination Claims

As noted above, to establish a prima facie case under the ECOA, "the plaintiff must demonstrate that: '(1) [he] was a member of a protected class, (2) [he] applied for credit from defendant, (3) [he] was qualified for credit but defendant denied [his] credit application, and (4) defendant continued to engage in the type of transaction in question with other parties with similar qualifications.'" *Griffin*, 2014 WL 204229, at *7 (alterations in original) (quoting *Gunter*, 2011 WL 1225791, at *4); *see also Powell*, 310 F. Supp. 2d at 487 (same).

Defendants first argue that Plaintiffs Germain, Zherka, Lexington Capital, and the Zherka Trust fail to allege that they applied for credit to satisfy the second element of a claim under the

ECOA. (Defs.' Mem. 20.) Because Germain and Lexington Capital were acting on behalf of Zherka, Silas Investments, and the Zherka Trust according the Amended Complaint and, therefore, do not have standing, as explained above, the Court will only address whether Zherka, the Zherka Trust, and Silas Investments have adequately alleged that they applied for credit to state a claim under the ECOA.[12]

To the extent that Defendants argue that Plaintiffs have failed to allege that Zherka and the Zherka Trust were applicants because Germain only submitted information "on the proposed purchase by . . . Silas Investment[s]," (Am. Compl. ¶ 36), the argument fails. To qualify as an "applicant" under the ECOA, a plaintiff need not point to a written or completed application. According to Regulation B, an "application" is defined as "an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." 12 C.F.R. § 202.2(f). As noted above, Zherka, the Zherka Trust and Silas Investments, acting through Germain, requested a meeting to discuss potential loans. Plaintiffs allege that "[a]s part of its loan application process, M&T Bank requires an initial package of information from the borrower describing the type of loan requested as well as a meeting with the potential borrower to discuss and fully comprehend the details of the loan transaction." (Am. Compl. ¶ 16.) Therefore, in requesting a meeting and submitting "information on a package of buildings . . . regarding loans . . . on behalf of . . . Silas Investments and The Zherka [Trust]," (*id.* ¶ 33), Plaintiffs made an oral request for credit according to the procedures allegedly used by M&T Bank. *See Stoyanovich*, 2007 WL 2363656, at *4 (rejecting the defendant's contention that the plaintiff's "completion and submission of a 'Personal Financial Statement' constituted a

---

[12] Even assuming that Germain and Lexington Capital had standing to assert a claim under the ECOA, there is no allegation in the Amended Complaint that Germain is a member of a protected class under the Act. Accordingly, even if Germain and Lexington Capital had standing to pursue ECOA claims, they fail to allege the first element of a prima facie case.

mere inquiry, not an application, and therefore, [the defendant's] duty to provide notification to [the plaintiff] pursuant to the ECOA never arose" because the evidence showed that the plaintiff "made a 'request for an extension of credit' that was 'in accordance with procedures used by' [the defendant] and thus constituted an 'application' for credit pursuant to ECOA").

Moreover, an Official Staff Interpretation addressing "[w]hen an inquiry or prequalification request becomes an application" pursuant to ECOA, advises:

> A creditor is encouraged to provide consumers with information about loan terms. However, if in giving information to the consumer the creditor also evaluates information about the consumer, decides to decline the request, and communicates this to the consumer, the creditor has treated the inquiry or prequalification request as an application and must then comply with the notification requirements under § 202.9. Whether the inquiry or prequalification request becomes an application depends on how the creditor responds to the consumer, not on what the consumer says or asks.

12 C.F.R. pt. 202, Supp. 1; *see Stoyanovich*, 2007 WL 2363656, at \*5 (relying on the staff interpretation to buttress its reasoning that the plaintiff was an applicant within the meaning of the ECOA). Here, Plaintiffs allege that in response to their inquiries for a meeting and their submissions, they were "discouraged and prevented from submitting additional information relating to [the 37-unit residential apartment building in Westchester County] and others," (Am. Compl. ¶ 36), and that based on a "google search" of Zherka, Walz testified that the "controversial headlines" that he discovered would prevent M&T Bank from approving any of "Zherka's loan transactions or the loan transactions of anyone associated with him," (*id.* ¶ 38). Moreover, Plaintiffs claim that on October 19, 2011, Walz "verbally informed . . . Zherka that his application for credit had been denied," (*id.* ¶ 83), and "reiterated that he would never be able to get a loan approved by M&T Bank's internal approval committee," and that "the committee members would say 'the real estate looks good; the cash flow looks good; the loan to value ratio looks good; but because it's Sam Zherka, they will recommend against it," (*id.* ¶ 52). Thus,

Walz allegedly evaluated information about the application (and any potential applications associated with Zherka), decided to decline to do business with him, and communicated this to Zherka. Accordingly, Zherka, the Zherka Trust, and Silas Investments have adequately alleged that they were applicants to satisfy the second prong of an ECOA claim. *See Treadway*, 362 F.3d at 981 n.9 ("[E]ven if it was not an application in the beginning, when [the creditor] declined [the applicant's] request, it became an application and [the] creditor was required to comply with [ECOA's notice provisions]."); *Stoyanovich*, 2007 WL 2363656, at *5 ("[U]nder the reasoning of the federal agency statutorily charged with effectuating the purposes of the ECOA, when a creditor makes a decision to decline a request for credit based on information that it received through an inquiry from a prospective borrower, that inquiry constitutes an 'application' for credit purposes of ECOA."); *Bagley v. Lumbermens Mut. Cas. Co.*, 100 F. Supp. 2d 879, 882 (N.D. Ill. 2000) (concluding that because the ECOA "applies to commercial loans . . . . a creditor that refuses to lend to a business because of the race of the applicant, e.g., a prospective partner or incorporator, would be in violation" of the ECOA (emphasis added)).

Next, Defendants argue that Plaintiffs do not allege the third element of a claim under the ECOA—that they were qualified for credit but Defendants denied their credit application. (Defs.' Mem. 22.) Indeed, it is questionable whether Plaintiffs adequately allege that they were qualified for the loan that they sought. Plaintiffs assert that M&T Bank evaluates applications based on "the location of the property securing the loan, the rent roll generated by the property, tenancy, market position, cash flow generation, and the amount of excess income over the proposed debt service." (Am. Compl. ¶ 39.) Plaintiffs do not, however, allege that they satisfied this criteria relative to the financing that they wanted to procure. The Amended Complaint contains no specific allegations about the loan or loans that Plaintiffs requested. In fact, it is

unclear from the Amended Complaint what credit Plaintiffs sought from M&T Bank. Plaintiffs merely allege that they were "interested in arranging for substantial real estate financing," (*id.* ¶ 27), and that the size of loans for multi-family properties "ranges from a couple of hundred thousand dollars to a couple of hundred million dollars," (*id.* ¶ 32). Moreover, while the Amended Complaint states that Walz informed Zherka that the Committee Members would never approve a loan on behalf of Zherka because they would say "the real estate looks good; the cash flow looks good; [and] the loan to value ratio looks good; but because it's Sam Zherka, they will recommend against it," (*id.* ¶ 52), this allegation does not specifically allege that Plaintiffs were qualified for the loan for which they were potentially interested. Finally, even though Plaintiffs allege that "Zherka, Silas Investments[,] and the Zherka Family Irrevocable Trust were qualified for the loans requested," (*id.* ¶ 61), it is questionable whether such a conclusory statement, standing alone, is sufficient to state a claim under the ECOA. *See Bojorquez v. Wells Fargo Bank, NA*, No. 12-CV-2077, 2014 WL 1883674, at *3 (D. Or. May 8, 2014) (dismissing the plaintiffs' claim because they "neglect[ed] to allege any facts demonstrating that they were eligible for but nonetheless denied credit"); *Vasquez v. Bank of Am., NA*, No. 13-CV-2902, 2013 WL 6001924, at *13 (N.D. Calif. Nov. 12, 2013) (noting that an ECOA plaintiff "must . . . allege specific facts, not mere conclusory assertions, demonstrating that she qualified for credit and was denied credit despite being qualified" (internal quotation marks omitted)); *cf. Adams v. U.S. Bank*, No. 10-CV-10567, 2010 WL 2670702, at *2 (E.D. Mich. July 1, 2010) (dismissing ECOA claim because, among other things, the plaintiff failed to allege that she was qualified for a loan modification and was denied relief despite her qualification).

Assuming, arguendo, that Plaintiffs have adequately pled that they were qualified for the loan that they sought but were denied that loan, Plaintiffs fail to satisfy the fourth element of a

prima facie case—that Defendants "'continued to engage in the type of transaction in question with other parties with similar qualifications.'" *Griffin*, 2014 WL 204229, at \*7 (quoting *Gunter*, 2011 WL 1225791, at \*4). Plaintiffs allege that Walz stated he and M&T Bank would "love to get [their] arms around [Mr. C's multi-family loan transactions]," and Mr. C is "a white male and NOT of Albanian or Muslim descent." (Am. Compl. ¶ 50).[13] There are no allegations, however, that suggest Mr. C and Zherka were similarly qualified for a loan. Indeed, there are no allegations whatsoever as to Mr. C's qualifications or creditworthiness, and, as noted above, Plaintiffs fail to provide details about their qualifications or creditworthiness. Accordingly, there is little if any basis on which to conclude that Mr. C and Plaintiffs were similarly situated. More importantly, however, even assuming that Mr. C and Plaintiffs were similarly situated in their qualifications, Plaintiffs do not allege that the hypothetical Mr. C ever applied for a loan or contacted Walz about arranging a meeting for financing. Thus, Plaintiffs fail to allege facts that Defendants "engage[d] in the type of transaction in question with other parties with similar qualifications," *Griffin*, 2014 WL 204229, at \*7, specifically someone with "controversial headlines . . . [that] would prevent . . . M&T Bank from approving any . . . loan transactions," (*Id.* ¶ 38), and, therefore, they do not establish a prima facie case under the ECOA. *Cf. Gross*, 669 F. Supp. at 54 (concluding that the plaintiff failed to establish a prima facie case because she had "failed to demonstrate that she and [another applicant] were of similar credit stature"). Plaintiffs therefore do not allege a prima facie case of discrimination under the ECOA.

### c. Notification Claims

As noted above, to prevail on an ECOA notice claim, a plaintiff must establish that: "(1) [the defendant] is a creditor, (2) [the plaintiff] is a loan applicant, (3) [the defendant took]

---

[13] As noted above, there is no allegation or indication in the Amended Complaint that Defendants knew Zherka's religious affiliation.

adverse action with respect to [the plaintiff's] credit application, and (4) [the defendant failed] to

provide [the plaintiff] with an ECOA-compliant notice of its adverse action." *See Stoyanovich*,

2007 WL 2363656, at *2 (citing *Madrigal*, 423 F.3d at 822). Defendants argue that Germain and

Zherka lack standing to assert the notification claims. As to Germain, the Court agrees because

he does not have standing for the reasons discussed above and, accordingly, Germain's notice

claim is dismissed.

Zherka, however, states a claim for the violation of the ECOA's notification provisions.

There is no dispute that as a bank with a commercial lending department, M&T Bank is a

creditor. For the reasons explained above, Zherka has adequately alleged he was a loan

applicant. Walz's verbal denial of the application on October 19, 2011 constitutes an adverse

action. *See* 15 U.S.C. § 1691(d)(6) (defining "adverse action" as a "denial . . . of credit").

Finally, Plaintiffs allege that Defendants "fail[ed] to provide . . . Zherka with any information or

statement of reasons for denying [the] application," (Am. Compl. ¶ 85), and Defendants do not

dispute this allegation for the purpose of the instant Motion. A verbal denial is insufficient under

the ECOA. *See* 15 U.S.C. § 1691(d) (requiring that "[e]ach applicant against whom adverse

action is taken shall be entitled to a statement of reasons for such action from the creditor,"

which may be satisfied by either "providing statements of reasons in writing" or "giving written

notification of adverse action" that discloses "the applicant's right to a statement of reasons" and

"the identity of the person or office from which such statement may be obtained.") Accordingly,

Zherka states a claim for violation of the ECOA's notification provisions.

### D. Slander Per Se Claim

In their eleventh cause of action, Plaintiffs allege that Walz made false statements against

Zherka with reckless disregard of their truth or falsity and/or with malice. (Am. Compl. ¶¶ 175–

183.) Specifically, Plaintiffs allege that Walz's statements against Zherka "were slanderous per se because they allege that . . . Zherka was involved in organized crime," (*id.* ¶ 179), and that the statements "permanently damaged . . . Zherka's professional reputation in his business and his ability to obtain financing," (*id.* ¶ 181), as well as the reputation of Silas Investments and the Zherka Trust and their ability to obtain financing, (*id.* ¶¶ 182–83).

### 1. Applicable Law

"The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen*, 239 F.3d 256, 265–66 (2d Cir. 2001); *see also Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 214 (S.D.N.Y. 2014) (same). "Whether particular words are defamatory presents a legal question to be resolved by the court[] in the first instance." *Celle v. Fillipino Reporter Eters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (citations omitted). Accordingly, courts should evaluate each allegedly defamatory statement to determine whether it is actionable at the pleading stage. *See Biro v. Conde Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012) (explaining that "the [c]ourt [would] evaluate each allegedly defamatory statement (or set of statements) and determine whether it is actionable, granting dismissal of claims based on nonactionable statements and denying dismissal with respect to claims based on actionable statements"); *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995) ("Where a plaintiff alleges that statements are false and defamatory, the legal question for the court on a motion to dismiss is whether the contested statements are reasonably susceptible of a defamatory connotation.").

"Under New York law, words are per se defamatory if they import criminal activity, impute certain types of diseases, tend to injure a party's trade, occupation, or business, or impute certain sexual conduct." *Campanella v. County of Monroe*, 853 F. Supp. 2d 364, 371 (W.D.N.Y. 2012) (citing *Epifani v. Johnson*, 882 N.Y.S.2d 234, 242 (App. Div. 2009)); *see also Albert*, 239 F.3d at 271 ("The four categories of statements that have historically constituted slander per se in New York are those that (i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute unchastity to a woman." (citing *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992)). "The issue of whether a statement is actionable per se is for the court." *Id.* at 271; *see also Mosdos*, 14 F. Supp. 3d at 214 (same).

### 2. Application

#### a. Actionable Opinion

First, Defendants argue that Walz's alleged statement that Zherka is "no good" is a non-actionable opinion. (Defs.' Mem. 12.) "[O]nly factual statements are actionable as defamation or libel . . . because New York law protects derogatory statements which may be categorized as 'opinion' as opposed to 'fact.'" *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014). "Determining whether a statement is an allegation of fact or mere opinion is a legal question for the court." *Id.* To determine whether a statement is an opinion or a fact, courts look to four factors: "(1) whether the specific language in issue has a precise, meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication[,] including the existence of

any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006) (internal quotation marks omitted); *see also Chau*, 771 F.3d at 128–29 (same). "[C]ourts should not consider . . . statement[s] in question in isolation, but must analyze statements 'in the context of the entire communication and of the circumstances in which they were . . . written . . . .'" *Pisani v. Staten Island Univ. Hosp.*, No. 06-CV-1016, 2008 WL 1771922, at *12 (E.D.N.Y. Apr. 15, 2008) (first alteration added) (quoting *Celle*, 209 F.3d at 179).

"[I]f a statement is found to contain opinion, the court must next determine whether the statement is 'pure opinion' (and thus non-actionable) or 'mixed opinion' (and therefore actionable)." *Chau*, 771 F.3d at 129. "Pure opinion is a statement of opinion which is accompanied by a recitation of the facts upon which it is based or does not imply that it is based on undisclosed facts." *Id.* (internal quotation marks omitted); *see also Biro*, 883 F. Supp. 2d at 461 ("A statement of 'pure opinion' is one which is either 'accompanied by a recitation of the facts upon which it is based' or 'does not imply that it is based upon undisclosed facts.'" *Biro*, 883 F. Supp. 2d at 461 (quoting *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986)). A statement of "mixed opinion," on the other hand, "is an opinion that *does* imply a basis in undisclosed facts, or facts known only to the author." *Chau*, 771 F.3d at 129. While statements of "mixed opinion" are actionable, *see id.*, "New York law absolutely protects statements of 'pure opinion,' such that they can never be defamatory," *Kirch*, 449 F.3d at 402 (internal quotation marks omitted); *see also Vinas v. Chubb Corp.* 499 F. Supp. 2d 427, 435 (S.D.N.Y. 2007) (same). "This is because a statement of opinion is not an assertion of fact that can be

proved false, and '[a]n assertion that cannot be proved false cannot be held libelous.'" *Biro*, 883

F. Supp. 2d at 459–60 (quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)).

Here, the Court finds that Walz's statement that he would not do business with Zherka

because he was "no good" is actionable as a "mixed opinion." Several courts have held that

general statements, such as describing a person as "no good," are non-actionable opinions

because such statements are comprised of "the type of hyperbolic language that lacks precise

meaning and is incapable of being proven true or false." *Chau v. Lewis*, 935 F. Supp. 2d 644,

660 (S.D.N.Y. 2013) (collecting cases), *aff'd*, 771 F.3d 118 (2d Cir. 2014); *see also Vinas*, 499

F. Supp. 2d at 436 (statements that the plaintiff "was 'too small' and 'no good' were subjective,

[could not] be proven 'true' or 'false,' and [were] thus non-actionable statements of opinion").

Standing alone, the statement that Zherka was "no good" qualifies as a non-actionable opinion

because it is not capable of verification and lacks precise meaning.

However, the inquiry as to whether a statement is defamatory does not end by concluding

that a statement is an opinion—rather, the Court must look at the context of Walz's statement to

determine whether it constitutes a mixed opinion that is actionable under New York law. *See*

*Chau*, 771 F.3d at 129. As alleged, Walz made the statement that Zherka was "no good" to

explain that he would not "do business" with Zherka and "alluded that . . . Zherka had ties to the

Albanian mob." (Am. Compl. ¶ 49.) These allegations suggest that Walz based his opinion on

facts not disclosed to the private investigator, *see Biro*, 883 F. Supp. 2d at 462 (finding that

"although the context and language used suggest that [the defendants] were stating their

subjective opinions of [the plaintiff], the statements [that the plaintiff was a 'con artist']

impl[ied] the existence of undisclosed facts on which those opinions were based"), or that his

opinion was based on Zherka's supposed Albanian mob ties—a statement of fact that may be

proven or disproven, *see Dworin v. Deutsch*, No. 06-CV-13265, 2008 WL 508019, at \*3

(S.D.N.Y. Feb. 22, 2008) (explaining that "both the opinion and the facts upon which it is based

are false," and therefore, "the opinion and facts may form the basis of a defamation claim")

(citing *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377 (S.D.N.Y. 1998)). Accordingly,

drawing all reasonable inferences in Plaintiffs' favor, while the statement that Zherka is "no

good" is an opinion, the context in which it was made plausibly suggests that it is based on

undisclosed facts or on facts that are challenged as untrue and, therefore, the statement is not per

se barred as a "pure opinion."

### b. Particularity

Defendants next argue that Plaintiffs' allegation that Walz "alluded" to Zherka's ties to

the Albanian mob "cannot form the basis of a slander claim since New York law requires that

'the particular words complained of . . . be set forth in the Complaint.'" (Defs.' Mem. 13

(alteration in original) (quoting N.Y. C.P.L.R. § 3016(a)). "Although the New York Civil

Practice Law and Rules ("CPLR") requires a defamation plaintiff to plead the words of the

purported defamation with particularity, that procedural requirement does not govern in federal

court." *Sanders-Peay v. NYC Dep't of Educ.*, No. 14-CV-4534, 2014 WL 6473507, at \*4

(E.D.N.Y. Nov. 18, 2014) (citation omitted). Rather, a plaintiff "need only plead her claim 'with

sufficient particularity to put the defendants on notice,' as required by Rule 8 of the Federal

Rules of Civil Procedure." *Id.* at \*4 (quoting Fed. R. Civ. P. 8); *see also Campbell v. Aduddell*,

No. 11-CV-1413, 2014 WL 4659364, at \*6 n.3 (N.D.N.Y. Sept. 17, 2014) ("New York State's

strict pleading requirements for libel or slander do not apply in this diversity action." (citation

omitted)). Nevertheless, "[w]hile the federal rules do not require the particularized pleading

requirements set forth in New York's C.P.L.R. section 3016, Rule 8 [of the Federal Rules of

Civil Procedure] still requires that each pleading be specific enough to afford [the] defendant sufficient notice of the communications complained of to enable him to defend himself." *Biro*, 883 F. Supp. 2d at 456 (quoting *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, No. 06-CV-1260, 2009 WL 4547792, at *8–9 (E.D.N.Y. Dec. 1, 2009) (internal quotation marks omitted)). Specifically, "the . . . complaint must at least 'identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published.'" *Neal v. Asta Funding, Inc.* No. 13-CV-2176, 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014) (quoting *Mobile Data Shred, Inc. v. United Bank of Switzerland*, No. 99-CV-10315, 2000 WL 351516, at *6 (S.D.N.Y. Apr. 5, 2000)).

Here, Plaintiffs allege that "[o]n March 5, 2013 at approximately 12:00 noon at the Modern Bar Restaurant in Armonk New York, . . . Walz met with a private investigator purporting to be a mortgage broker" and "Walz told the private investigator that he would not do business with . . . Zherka because he was 'no good' and alluded that . . . Zherka had ties to the Albanian mob." (Am. Compl. ¶ 49.) There is no doubt that the Amended Complaint identifies who made the statements, when they were made, and to whom. Defendants suggest that the defamation claim is nevertheless "defective under New York law" because the Amended Complaint states Walz "alluded" to Zherka's Albanian mob ties. (Defs.' Mem. 13.) The cases that Defendants cite to support this proposition, however, dismissed claims for failure to adequately plead slander pursuant to CPLR § 3016(a), which does not govern the federal pleading standard, as discussed above. Here, Walz's alleged statements are sufficient to satisfy the requirements of Rule 8 because even though the Amended Complaint does not provide the precise words that Walz used to "allude[] that . . . Zherka had ties to the Albanian mob," (Am.

43

Compl. ¶ 49), the allegation puts Defendants on notice as to the alleged defamatory statements. *See Dollar Phone Corp. v. Dun & Bradstreet Corp.*, No. 09-CV-3645, 2010 WL 5313737, at \*6 (E.D.N.Y. Sept. 2, 2010) (finding the plaintiff had stated a claim for libel sufficient to satisfy the requirements of Rule 8 based on the allegations that the defendant published "false information indicating that [the plaintiff] 'did not timely pay its obligations to [the defendant]'"), *adopted by* 2010 WL 5313757 (E.D.N.Y. Dec. 20, 2010); *Unique Sports Generation, Inc. v. LGH-III, LLC*, No. 03-CV-8324, 2005 WL 2414452, at \*9 (S.D.N.Y. Sept. 30, 2005) (rejecting the argument that the claim for defamation failed because the claimant did not adequately allege the particular words complained of because, among other things, "a claim for defamation brought in federal court is governed by Federal Rule of Civil Procedure 8, and not, as Plaintiff asserts, [CPLR 3016(a)]"); *Griffin-Nolan v. Providence Wash. Ins. Co.*, No. 04-CV-1453, 2005 WL 1460424, at \*2, \*12 (N.D.N.Y. June 20, 2005) (denying the defendants' motion to dismiss where the plaintiff alleged that an affidavit "contained a number of statements that were false and that [the defendant] knew to be false when he made them" because Rule 8 only requires a "short and plain statement of the claim and simple, concise, and direct allegations" (internal quotation marks omitted)).[14]

### c. Publication

Defendants argue that Zherka's slander claim fails on the ground that Zherka consented to the publication of Walz's allegedly defamatory statements by hiring a private investigator to elicit such statements. (Defs.' Mem. 14.) "Under New York defamation law, 'publication is a term of art . . . A defamatory writing is not published if it is read by no one but the one defamed. Published it is, however, as soon as read by any one else.'" *Albert*, 239 F.3d at 269 (alteration in

---

[14] In denying Defendants' Motion to Dismiss, the Court recognizes that further factual inquiry, i.e., at the summary judgment stage, might yield a different result.

original) (quoting *Ostrowe v. Lee*, 175 N.E. 505, 505 (1931)). "Decisions of New York's intermediate appellate courts have established that the consent of the person defamed to making of a defamatory statement bars that person from suing for defamation, and that, in some circumstances, a person's intentional eliciting of a statement she expects will be defamatory can constitute her consent to the making of the statement." *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 199 (2d Cir. 2015) (collecting cases); *see also McNamee v. Clemens*, 762 F. Supp. 2d 584, 604–05 (E.D.N.Y. 2011) (collecting cases and noting that "[a] review of case law indicates that the type of consent accepted as a completed defense to a defamation action is specific consent, typically initiated by the plaintiff, which clearly indicates that the plaintiff was aware of and agreed to the possibility that defamatory statements might be published"). Specifically, New York courts have held that if a plaintiff "consent[s] to the publication of the alleged defamatory statements by soliciting them through his agents, . . . such consent constitutes a complete defense to an action for defamation" as a matter of law and, therefore, a complaint fails to state a cause of action. *LeBreton v. Weiss*, 680 N.Y.S.2d 532, 532 (App. Div. 1998); *see also Dickson v. Slezak*, 902 N.Y.S.2d 206, 209 (App. Div. 2010) (explaining that the statements at issue were "subject to the complete defense that, because plaintiff hired [a private investigator] to garner what he had every reason to anticipate would be defamatory comments from defendants, [the plaintiff] implicitly consented to the publication of such comments").

After "[c]onsidering the scant and not-altogether-consistent New York case authority entirely from lower courts, and the elucidation to be found in the Restatement [(Second) of Torts (1977)]," the Second Circuit has explained that "it appears . . . that New York's standard [for when a plaintiff consents to a publication] would be along the following lines: When a plaintiff

sues for defamation based on a statement . . . the more evidence that supports the proposition that

the plaintiff elicited the statement with a high degree of certainty that it would be defamatory, for

the purpose of enabling a lawsuit, the stronger the defendant's case for deeming the statement

consented to, thus barring the claim." *Sleepy's LLC*, 779 F.3d at 199.  Based on this principle,

the Second Circuit remanded a case for the district court to make findings:

> [A]s to whether [the plaintiff's] inquiries [into potential slander by the defendant]
> were motivated by a good faith attempt to learn whether the [defendant's] sales
> force was carrying on a consistent pattern of slander, or were merely a ruse to
> decoy [the defendant] into a lawsuit, along with the closely related question [of]
> what was the degree of [the plaintiff's] confidence or certainty at the time of each
> inquiry that such a pattern of slander existed.

*Id.* at 201.

Plaintiffs allege that on March 5, 2013, "Walz met with a private investigator purporting

to be a mortgage broker," and made the alleged statements to the private investigator.  (Am.

Comp. ¶ 49.)  In circumstances closely analogous to those alleged here, New York courts have

found that consent is a complete defense to a slander claim when the plaintiff has hired a private

investigator or asked individuals to pose as someone else to illicit information.  *See Dickson*, 902

N.Y.S.2d at 208 (affirming summary judgment against the plaintiff because, among other

reasons, the "plaintiff's name did not become part of any conversation with defendants unless

and until [a private investigator posing as a potential real estate broker] inquired about [the]

plaintiff's ethics and business methods" and "[o]nly then did [the] defendants make any

comment with regard to [the] plaintiff"); *LeBreton*, 680 N.Y.S.2d at 532 (affirming the dismissal

of the plaintiff's defamation action because the plaintiff asked two individuals to contact the

defendant "under the pretense of being landlords and had them make certain inquiries to which

[the] defendant responded by making the defamatory statements upon which [the] action [was]

premised").  Here, however, it is not clear from the face of the Amended Complaint who the

private investigator was acting at the behest of or the purpose of the investigator's meeting with
Walz. *Cf. Dickerson*, 902 N.Y.S. 2d at 208 (finding the plaintiff implicitly consented to the
allegedly defamatory comments where the "plaintiff hired [the private investigator] to garner
what he had every reason to anticipate would be defamatory comments from defendants").
Moreover, even assuming that the private investigator was acting on behalf of Zherka, the Court
cannot resolve the question of Zherka's degree of certainty that Walz would make the alleged
statements on a motion to dismiss. *See Sleepy's LLC*, 779 F.3d at 201 (remanding to the district
court "to make findings on . . . whether [the plaintiff's] inquiries were motivated by a good faith
attempt to learn whether the [defendant's] sales force was carrying on a consistent pattern of
slander, or were merely a ruse to decoy [the defendant] into a lawsuit, along with the closely
related question [of] what was the degree of [the plaintiff's] confidence or certainty at the time of
each inquiry that such a pattern of slander existed"). Accordingly, Defendants' Motion is denied
as to Plaintiff's slander claim.[15]

### E. Section 1985 Claim

Plaintiffs also assert a cause of action under 42 U.S.C. § 1985(3), which "prohibits, in
pertinent part, conspiracies undertaken 'for the purpose of depriving, either directly or indirectly,
any person or class of persons of the equal protection of the laws, or of equal privileges or
immunities under the laws.'" *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y.,
Inc.*, 968 F.2d 286, 290 (2d Cir. 1992) (quoting 42 U.S.C. § 1985(3)). "The elements of a claim
under § 1985(3) are: (1) a conspiracy; (2) for the purpose of depriving, either directly or
indirectly, any person or class of persons of equal protection of the laws, . . . ; (3) an act in
furtherance of the conspiracy; (4) whereby a person is . . . deprived of any right of a citizen of

---

[15] Of course, the factual landscape surrounding this claim may be clarified during
discovery, thus allowing Defendants to re-visit this issue in a summary judgment motion.

the United States." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999) (alterations in original) (internal quotation marks omitted); *see also Bliss v. Rochester City Sch. Dist.*, 196 F. Supp. 2d 314, 337 (W.D.N.Y. Mar. 28, 2002) (same), *aff'd*, 103 F. App'x 421 (2d Cir. 2004). "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted). "[A]n action will lie under § 1985(3) when a plaintiff is injured by a private conspiracy to interfere with his [or her] constitutional rights, so long as there is some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Jews for Jesus, Inc.*, 968 F.2d at 290–91 (internal quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996) ("The conspiracy must be motivated by racial or related class-based discriminatory animus."). "[C]laims of conspiracy that are vague and provide no basis in fact must be dismissed." *Van Dunk v. St. Lawrence*, 604 F. Supp. 2d 654, 663 (S.D.N.Y. 2009) (internal quotation marks omitted).

Defendants argue that because Defendants are employees of the same entity, the § 1985 claim succumbs to the intracorporate conspiracy doctrine. (Defs.' Mem. 8.) "Under the intracorporate conspiracy doctrine, officers, agents[,] and employees of a single corporate entity are legally incapable of conspiring together." *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 291 (E.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999)); *see also Guichard v. Town of Brookhaven*, 26 F. Supp. 3d 219, 227 (E.D.N.Y. 2014) (same); *Burrell v. City Univ. of N.Y.*, 995 F. Supp. 398, 414 (S.D.N.Y. 1998) (same). Here, according to the allegations in the Amended Complaint, Defendants were all employees of M&T Bank who were acting within the scope of

their employment. Therefore, the intracorporate conspiracy doctrine bars Plaintiffs' claim unless an exception the doctrine applies.

Plaintiffs rely on the First Circuit's holding in *Stathos v. Bowden* that the intracorporate conspiracy doctrine does not apply to "conduct involv[ing] a series of acts over time." 728 F.2d 15, 21 (1st Cir. 1984). The Second Circuit has not weighed in on this theory. District courts in the Second Circuit that have considered it have rejected it because, among other reasons, "such a line responds neither to the text nor to the objectives of Section 1985[,] . . . . [which] depends on multiple actors, not on multiple acts of discrimination or retaliation." *Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 723–24 (S.D.N.Y. 1997) (quoting *Travis v. Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 111 (7th Cir. 1990)); *see also Raghavendra v. N.L.R.B.*, No. 08-CV-8120, 2009 WL 5908013, at *16 (S.D.N.Y. Aug. 27, 2009) (rejecting the plaintiff's "contention that corporate agents can conspire where there are longstanding or multiple instances of discrimination, as opposed to a single act of discrimination based on decisions from the First, Third[,] and Eleventh Circuits . . . . in light of the controlling Second Circuit decisions"). However, at least one district court in the Second Circuit has applied this limitation on the doctrine. *See Yeadon v. N.Y.C. Transit Auth.*, 719 F. Supp. 204, 212 (S.D.N.Y. 1989) (holding that "the defense that a single corporation and its employees cannot conduct a conspiracy" does not apply "because plaintiffs have adequately alleged a series of separate discriminatory acts by the corporate entity and its agents").

Although the Court agrees with the courts that have held that the intracorporate conspiracy doctrine is not limited to single act because the text of § 1985(3) is dependent on multiple actors, the Court need not resolve whether this exception applies. Here, even if Plaintiffs' claim is not barred by the intracorporate conspiracy doctrine, the claim nonetheless

49

fails as Plaintiffs do not adequately state a claim a conspiracy under § 1985. Although Plaintiffs have alleged discriminatory animus on behalf of Defendants based on statements that Walz communicated to the private investigator and various bank employees communicated to Zherka, Plaintiffs do not "provide [a] factual basis supporting a meeting of the minds, such that [D]efendants entered into an agreement . . . to [deprive Plaintiffs of constitutional rights]." *Webb*, 340 F.3d at 110 (internal quotation marks omitted). Instead, Plaintiffs merely allege that "Defendants conspired to deprive Plaintiffs of their constitutional rights, and carried out such conspiracy," that "Defendants entered into an agreement to deprive Plaintiffs of their constitutional rights, specifically, their rights to substantive due process and the equal protection of the law," and that "Defendants committed one or more overt acts in furtherance of the conspiracy in denying Plaintiff[s]' request for credit." (Am. Compl. ¶¶ 153–155.) These conclusory allegations are insufficient to state a claim for conspiracy. *See Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss" (internal quotation marks omitted)); *Doe v. Selsky*, 973 F. Supp. 300, 305 (W.D.N.Y. 2013) (dismissing the plaintiff's conspiracy claim because the "[p]laintiff . . . alleged that [the] defendants violated his constitutional rights, and . . . then simply tacked on a conclusory allegation that those violations were committed pursuant to a conspiracy"); *Traylor v. Stweard*, No. 10-CV-639, 2011 WL 4452197, at *4 (D. Conn. Sept. 26, 2011) (dismissing the plaintiff's conspiracy claim because the plaintiff "has not alleged any specific facts to demonstrate such a meeting of the minds other than the conclusory allegation that all of the defendants acted jointly in concert with each other and have conspired together with other White-Americans to deprive him of his rights," and it was "not evident from the complaint that

many of the [d]efendants had any connection to each other or even knew of each other" (internal quotation marks omitted), *aff'd*, 486 F. App'x 948 (2d Cir. 2012)).  Defendants' Motion To Dismiss the § 1985(3) claim is granted.

### III.  Conclusion

In light of the foregoing analysis, the Court grants in part and denies in part Defendants' Motion To Dismiss Plaintiffs' Amended Complaint.  Specifically, Germain's and Lexington Capital's claims under the ECOA and NYHRL are dismissed for lack of standing.  Zherka, the Zherka Trust, and Silas Investments' claims of discrimination under the ECOA and NYHRL are dismissed without prejudice.  Plaintiffs' claims under the FHA are dismissed without prejudice. Plaintiffs' conspiracy claim pursuant to 42 U.S.C. § 1985 is dismissed without prejudice. Defendants' Motion as to Zherka's claim for violation of the ECOA's notification provision and Zherka's claim for slander is denied.  Plaintiffs are given 30 days to file a Second Amended Complaint.  The Clerk of Court is respectfully requested to terminate the pending Motion.  (Dkt. No. 36.)

SO ORDERED.

DATED:      June 1 , 2015
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

51